McBRIDE, Judge.
Plaintiff, Paul H. McAlister, aged 43, instituted this suit against Liberty Mutual Insurance Company, the workmen’s compensation insurer of Bernard & Byrd, Inc., his former employer, to recover workmen’s compensation benefits for permanent total disability at the maximum rate for injuries sustained in an accident on December 23, 1949, during the course and scope of his employment as master mechanic. McAlis-ter was standing on a timber brace which was hit by a piling, and as a result he, the timber, and the piling all fell a distance of IS to 20 feet into the Florida Avenue Canal. Plaintiff landed atop the timber in a sitting position.
It is not disputed that plaintiff sustained injuries in the fall. Besides three operations, he underwent an extended term of medical treatment, and defendant admits he was incapacitated for 189 weeks for which it paid workmen’s compensation to him at the rate of $30 per week.
After a trial of the case on its merits, the judge below held that plaintiff was totally and permanently disabled and judgment was rendered in his favor for workmen’s compensation pursuant to the provisions of LSA-R.S. 23:1221(2) at the rate of $30 per week beginning December 23, 1949, not to exceed 400 weeks (less credit for the 189 weeks already paid), together with legal interest on each installment from due date until paid.
Defendant has appealed suspensively from the judgment and adopts two alternative positions:
(1) That although McAlister was injured on December 23, 1949, he was as of August 27, 1953, completely cured and able to return to his former work and that he was paid all compensation to which he is entitled under the Statute.
(2) In the event McAlister has not fully recovered, he is only partially disabled, and under LSA-R.S. 23:1221(3) he is entitled to no more than 65 per cent of the difference between wages earned át the time of the injury and wages which he has been able to earn thereafter, however not beyond 300 weeks.
Immediately after the accident plaintiff was sent to Foundation Hospital for diagnosis and treatment. His symptoms led Dr. Robert C. Lynch, in whose charge he was placed, to suspect that he was suffering from intestinal obstructions, and Dr. Lynch performed an operation referred to as an abdominal exploratory laparotomy which failed to disclose any physical condition related to the accident of December 23, 1949. The conclusion reached by Dr. Lynch was that the symptoms which led him to suspect an intestinal obstruction resulted solely from an allergic reaction to anti-tetanus serum and adhesions from *356 prior operations. The adhesions were corrected by Dr. Lynch. Seven-days afterward plaintiff developed clots in the veins of the left leg and Dr. Lynch performed what is called a ligation (a tying off of the veins). Following his convalescence from the operative procedures performed, Dn Lynch discharged McAlister as fully cured and as able to return to hard manual labor.
Plaintiff returned to work for Bernard & Byrd, Inc., on or about May 1, 1950, but because of pain and discomfort in his low back and legs he was forced to discontinue his efforts on or about July 11, 1950, and was sent back to Foundation Hospital where he was referred to Dr. Homer D. Kirgis, an experienced neurosurgeon. Dr. Kirgis made diagnosis of plaintiff’s complaints and determined that there was a rupturefl intervertebral disc, and by surgical means he removed the protrusion of the disc in September of 1950. He referred to this operation' as a major one. Dr. Kirgis treated plaintiff until approximately June 9, 1951, and then, believing that he had fully recovered, he discharged him as able to return to all of his duties.
Following the medical discharge on June 9, 1951, plaintiff again went back to work but in the capacity of operating engineer and he was assigned in that capacity by his labor union to various construction jobs. -The record attests that he has worked on construction jobs ever since and his earnings at times have been substantially in excess of what they were prior to the accident in December of 1949. In passing we may say that McAlister’s present higher income does not seem to be the result of a higher, wage basé but because of the fact that he is working in Lake Charles and his employer, in addition to the wage scale, pays something in the way of a bonus. •
' McAlister has been working in the construction industry for seventeen years, and prior to the accident he had worked himself up to the grade of master mechanic. He had been in the employ of Bernard & Byrd, Inc., in that capacity for about six months before the accident. Previously he was a master mechanic with Keller Construction Company at Lake Charles, Louisiana, and this job and the one with Bernard & Byrd, Inc., were the only jobs whereon he worked ás master mechanic.
Considerable ‘evidence was adduced going to show what are the duties of a master mechanic. McAlister’s testimony is that he was required to supervise and repair any and all kinds of heavy equipment on construction jobs and was very often called upon to operate the equipment. It seems that not infrequently machinery breaks down and it then becomes the duty of the master mechanic to make repairs with the assistance of the men working under him. Plaintiff explained that when the accident occurred in December of 1949 he was actually engaged in repairing a crane. He said:
“ * * * We had the machine tore down right in the middle of the Gen- ■ tilly Boulevard, right on the pavement. We had taken the tracks out from under it, jacked the cab up with these jacks, and pulled the tracks out from under it, and I was changing the center pin and the center pin bushing.”
McAlister said further that a master mechanic must be able to take engines of all kinds apart, such as bulldozers, cranes, pile drivers, pile-driver hammers, etc., and that there is “no limit on the (work of the) master mechanic; no limit.” He emphasized that the work requires a maximum of physical exertion and sometimes the workman is required to perform his duties in tight and close places even “up in the air on a building or down in a hole.” As an example, he told of some work he had done, thus:
“Well, we had a tractor, a bulldozer I think I worked on it several times. We had a concrete mixer. That would go bad on us. At least once a week I’d have to go inside the drum on it, fix the water float, and when we would get the mixer in a tight place, we might break a Universal . joint and I would have to go in and fix it. I had an operator that had *357 never run one before, and I had to teach him everything about it, so naturally I had to do all the repair work to show him what to do, so I'would have to change the Universal • joints every time we would get in a tight. The tractor part of our mixer would get in a bind and would break a Universal joint.”
William B. McDonnel, the business rep-resentaive of the International Union of Operating Engineers, testified that Mc-Alister was classified as and had been doing work of a master mechanic before the accident. The witness related in some detail the duties of a master mechanic which he considered extremely heavy work. Among other things, a master mechanic must be physically able to climb on machinery to make repairs and to see to it that all the machinery on the construction job site remains in an operating condition. He mentioned that the master mechanic must do heavy lifting of parts of heavy equipment, such as gears, bushings or whatever particular part has to be repaired.
James Little, a master mechanic, stated that he has known McAlister for some time and that he had worked with him both before and after the accident. When asked if the job of master mechanic required that a workman be in good physical condition, Little replied: “I’ll say it does.” He related how the master mechanic is called upon to do heavy lifting “to make repairs on anything that might break down” and to work in close places “and you also have some mighty strenuous places to get parts out, that you have to take loose to be repaired.”
Notwithstanding his discharge by Dr. Kirgis on June 9, 1951, McAlister insists that he has been able to return to work in the construction industry only as an operator, or, as counsel for defendant characterize it, an operating engineer, and not as master mechanic. He claims that his abdomen and back pain him, that his legs and muscles are “tight” and that if he stands too long his legs get weak, or if he sits too long his legs get stiff, and these are symptoms he never had prior to his accident. :
Since‘June 9, 1951, McAlister has not been wanting for work. It" appears that he has been employed by a number of concerns on construction projects and has served variously as boiler fireman, supervisor of lifts, assistant superintendent, and operator of a hoist, derrick,1 pump and compressor, wench, pile driver and crane. He says he has never had the rating of or worked as a master mechanic since his injuries because he cannot perform the duties thereof and that his áctivities are confined to lighter, less árduous, and a different type of work.
Since his discharge by Dr. Kirgis, the plaintiff was examined by two other physicians. Dr. Howard Karr, admittedly a qualified neurosurgeon, saw him on March 18, 1953, at the behest of defendant, and the doctor’s conclusion after a neurosurgical examination was that there was no residual back disability which would incapacitate plaintiff from the performance of his usual work. Dr. Karr did not appear as a witness in the case, but by agreement of counsel for the parties his written statement was received in evidence in lieu of his testimony. We have most carefully read this statement and nowheré in it is there anything that would infer or even suggest that Dr. Karr was apprised of or possessed knowledge of what particular duties are expected of a master' mechanic. Dr. Karr reported that be believed Mc-Alister could perform his “usual work.” We pause to wonder just what the “usual work” alluded to by Dr. Karr was. We notice that the report in giving a summary of plaintiff’s history sets forth that plaintiff:
. “ * * * belonged to the Operating Engineers Union and he was sent to various types of jobs. He states at the time he was injured his occupation. was that of a master mechanic. Since then he has engaged in various types of work involving the operating of a crane, pile‘driver; he states he did not operate a crane but has operated a steam hoist, compressors, and *358 pumps; and has been assistant superintendent for a foundation company.”
The fact of Dr.- Karr’s being uninformed as to what physical exertions are expected of a master mechanic leads to the logical conclusion that when he referred to “usual work” Dr. Karr meant the work that Mc-Alister was then engaged in, such as crane operator, pile driver, steam hoist operator, operator of compressors and pumps and assistant superintendent. Of course, Mc-Alister can do any and all of these things and he was actually doing them when Dr. Karr rendered-the report, but we are convinced that the.duties required in those jobs consist of lighter work and work different in kind from that which a master mechanic is required to perform.
The other physician to see and examine McAlister since.his return to work is Dr. O. L. Pollingue, an orthopedic surgeon, who appeared as a plaintiff witness. On January. 14, 1955, Dr. Pollingue found that McAlister,was haying some difficulty in the low bade region and he estimates th«re is a disability .rating of about 25 per cent of the body as a whole as a result of the disc operation. He thinks the 'disability will be permanent. Dr., Pollingue pointed out that following the removal of a disc the patient’s back is weakened to a certain extent. During the course of his examination he discerned certain-objective symptoms, particularly the absence of a curve in plaintiff’s back. However, Dr. Pollingue felt that plaintiff can do heavy work in spite of his disability and while he said plaintiff could lift heavy objects, he qualified that assertion by stating that plaintiff could do this only when in certain positions. Dr. Pol-lingue made it plain that he only examined the low back as that was the only complaint which is embraced in the field of orthopedics. He also added that at the time of his examination he knew McAlister was working as a pile driver but that he did not know the kind of work plaintiff was engaged in when he sustained the injuries:
The tenor of the record clearly and unmistakably 'indicates that McAlister, although able to perform substantially all of the duties of 'an operating engineer in con' struction work, is unable to do all of the tasks which would be required of a master mechanic to be done. We believe that his complaints are genuine and are convinced that he cannot cope with the strenuous duties which the repairing of construction equipment entails, such as lifting heavy objects and working in close quarters, which are a substantial part of a master mechanic’s duties. We likewise feel sure that the duties required in the two labor classifications, master mechanic and operating engineer, are quite dissimilar and that while a master mechanic might do what is required of an operating engineer, an operating engineer is not always physically competent or skilled enough to do the work of a master mechanic. By the standards of the construction industry the employment of an operating engineer does not embrace his making repairs to equipment, but on the other hand the master mechanic is required to do such work and to our minds this is the major difference between the two employments.
An examination of McAlister’s testimony, as well as of his lay witnesses, shows that each of the pieces of machinery hé has been able to operate since the return to work was either chosen by him or by the union officials after taking into account his physical limitations. In the interest not only of his . own physical welfare, but in the interest of the safety of his fellow workers as" well, McAlister has scrupulously avoided any operation which requires strenuous physical exertion. The operation of the multitudinous machinery, we are informed, requires only the pulling and manipulation of levers.
McDonnel, of the Union, testified that because of his physical deficiency McAlis-ter is not able to , carry on as a master mechanic, and he has not been sent out on any job as a master mechanic by the union because it is thought that, he- cannot hold such job. McDonnel .stated: “We don’t feel like recommending him because of our sense of responsibility to the' Associated General Contractors.” ■
*359 Little, who has been mentioned before, compared McAlister’s present condition with his condition as it was before the accident, and stated that McAlister could - formerly do any kind of work on a job but that he is now seriously handicapped, and on one occasion Little was obliged to make a special back rest on the seat of a crane in the interest of McAlister’s comfort. He states that McAlister is assigned only to lighter work.
Harold McGloin testified that he works with McAlister, and that since the latter’s accident he cannot even do all of the duties required of a pile-driver operator.
We are importuned by counsel for defendant that the testimony of Drs. Lynch and Kirgis is entitled to more weight than the other physicians because they treated McAlister and their observations of him both throughout their treatment and during the period of convalescence place them in the superior position to say what McAlis-ter’s physical condition really is. We cannot accept Dr. Lynch’s testimony for the obvious reason that after the abdominal operation and the subsequent ligating of the veins in McAlister’s leg, Dr. Lynch discharged his patient as being fully capable of returning to his employment when, as a matter of fact, McAlister at that time had a ruptured intervertebral disc which had to be corrected By surgery performed by Dr. Kirgis.
The opinion of Dr. Kirgis when he discharged McAlister was that he has normal mobility and is able to carry on his usual occupation, but nowhere in his testimony does it appear that Dr. Kirgis knew exactly the kind of work McAlister was engaged in prior to the date of the accident and, like Drs. Pollingue and Karr, we fail to understand how he was able to say that McAlister could return to his former duties. When he last saw him, McAlister was working as a fireman at the Port of Embarkation, and Dr. Kirgis’ statement is that he “felt that the fact that he was working regularly was also an indication that he had made a very satisfactory response to the operation.” We feel very much the same way about Dr. Kirgis’ opinion as we do about the.opinion of Dr. Karr.- Both physiciails knew McAlister was working when they saw him and not knowing the type'of work he was engaged in before he received his injuries, it is not unreasonable to believe that when they stated he could return -to work they very likely had in mind work of the kind he was then doing.
Defendant has cited several cases decided by the Court of Appeal of this state in which was discussed the ■ principle surrounding the admission of lay-testimony in a case such as this, and the argument is advanced that under the doctrine established by the cited cases, we should give no consideration to what the lay witnesses had to say from the witness stand. We aré cognizant that it has been held that the principle of dependence upon lay testimony should be resorted to only in those cases where the medical evidence is so evenly balanced or so violently conflicting as to prevent the court from drawing a conclusion. We have considered the lay testimony not because we believed the experts’ testimony to be in conflict, but rather .because we did not believe that the experts were even in a position to enlighten the court on the all-important question whether plaintiff was disabled. Had it not been for the evidence given by plaintiff, his fellow workers and the union official, who knew what duties a master mechanic must perform, there would have been nothing before the court from which it could be determined whether plaintiff can do work of any reasonable character. In view of the lack of expert testimony on the point in question, the lay -testimony must properly be considered.
We do not' believe this is a case where it can be said that the plaintiff has sustained a partial disability and is entitled to nothing more than the compensation provided for in LSA-R.S. 23:1221(3). On the contrary, the weak back and the 25 per cent disability of the whole body found to exist by Dr. Pollingue, whose testimony the trial judge believed, has had the effect of -rendering McAlister incápablé 'of per *360 forming a substantial portion of the duties which he would be required to do and perform as master mechanic, which was his occupation prior to and at the time he received the injuries. Therefore, he must be regarded as a workman who is totally and permanently disabled from doing work of any reasonable character within the purview of the Workmen’s Compensation Statute. See Wright v. National Surety Corp., 221 La. 486, 59 So.2d 695. The Supreme Court held in that case that a skilled workman who was required by his employment to operate an asphalt distributor, which he could no longer operate after his injuries, was to be considered totally and permanently disabled notwithstanding that he is able to drive an automobile or truck, because the driving of a motor vehicle is not of the same character as operating an asphalt distributor. We draw an analogy between the Wright case and the instant case.
Counsel for defendant argue that the phrase “disability to do work of any reasonable character” as contained in the com-1 pensation statute means disability to perform work of the same or similar description, kind or Character (not necessarily identical) as that which the claimant was accustomed to perform or was undertaking when the injury occurred. We are cited to Morgan v. American Bitumuls Co., 217 La. 968, 47 So.2d 739. The contention 'is then made that whereas McAlister is competent to perform the duties of an operating engineer, which, was an occupation to which he was accustomed and which he followed for' some years, ánd so long as he can do and is actually performing the duties of such calling, he cannot claim to be totally and permanently disabled within the inténdment of the workmen’s compensation laws.
We cannot agree with counsel. It is true that for some years the plaintiff did hire himself out as an .operating engineer and over a span of .seventeen years devoted to work as a-n employee on construction projects he succeeded in meriting the rating of master mechanic. We do not think that the Morgan case, would be authority for a holding that because plaintiff might, be able to do the work he had done some time in the past in another job category he is not now totally and permanently disabled. Plaintiff is no longer able to return to and perform the duties of a master mechanic or any duties similar thereto, and under the established jurisprudence of Louisiana that is to be the standard for testing his disability.
Plaintiff’s right to the benefits provided by law for a workman’ who is totally and permanently disabled as a result of injuries received in the course and scope of his employment is unaffected by his ability to perform, even at equal or better wages, the duties of another and dissimilar occupation. Ranatza v. Higgins Industries, Inc., 208 La. 198, 23 So.2d 45, affirming La.App., 18 So.2d 202; Butzman v. Delta Shipbuilding Co., Inc., La.App., 21 So.2d 80; Myers v. Jahncke Service, Inc., La.App., 76 So.2d 436 (writs refused). In the case lastly cited, this court followed the decision of the Supreme Court in Mottet v. Libbey-Owens-Ford Glass Co., 220 La. 653, 57 So.2d 218, and held that wages may be earned by an injured workman even from the same employer in a higher job classification without loss of the claimant’s right to workmen’s compensation for total and permanent disability.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.
JANVIER, J., dissents with written reasons.