JOHNSON, Judge.
The trial court dismissed this suit for workmen’s compensation and the plaintiff has appealed.
On July 12, 1958, the plaintiff took temporary employment during a strike as an inspector of glass bottles being manufactured by Underwood Glass Company. About the last week of July or the first week of August, the exact time being uncertain and unimportant, while working at night, plaintiff was struck by a quart bottle thrown by another employee toward a bin, the bottle glanced off the side of the bin and *177 struck her right shoulder at the base and a little to the back side of the neck.
On account of some labor dispute at the time insured’s factory was being picketed, and in order to enable this plaintiff and other employees to enter and leave the factory without controversy, insured’s manager, Mr. Schexnaydre, transported this plaintiff and other employees in an automobile. Plaintiff worked on the night shift. Before the end of the work period in the early morning the factory experienced mechanical difficulty with the conveyor belt which paraded the finished bottles in front of the plaintiff for inspection. While the trouble was being repaired, the plaintiff testified that she sat down to rest. When struck by the bottle she said she grabbed the back of her neck and cried out. (Mrs. Populis, a fellow worker, said the plaintiff jumped up and hollered: “Oh, my back! ”) She quoted the person who threw the bottle as saying, “Gee, you have a strong back,” to which she answered “Strong back? That hurt! ” About that time the conveyor belt began to move and she went back to work. The plaintiff testified further that on that morning, at the end of the night shift, when Mr. Schexnaydre was transporting her and other employees to their homes, she told him about the accident and complained that her neck hurt; that his only comment was that “the boy should have hit me on the other side;” that she would tell Schexnaydre almost every night when he came to transport the employees that she was hurting as a result of the accident and, on one of these occasions, he said her only trouble was that she was getting old. She continued to work, but after a few weeks the pain extended down her right arm with swelling and numbness in her right hand and thumb so that she was having difficulty in holding the bottles up for inspection as she was required to do. As she continued to work her pain and disability became so severe that she asked her supervisor, who was a lady named “Ruth”, to change her work to something in which the use of her hand was not so exacting and that this change was made.
There is no doubt about the accident and how it happened. The testimony of the plaintiff as to how the accident affected her, the plaintiff’s continued frequent complaints to Schexnaydre and what he said, is amply supported by the lay witnesses. If any weight whatever is to be given this testimony, the total disability found by the trial judge is definitely the result of this accident.
The plaintiff continued to work long hours each work day. On August 28, about a month after the accident, she told Schexnaydre that if she did not get some medical attention she would be compelled to quit work. Schexnaydre then sent her to Dr. Herman Rabin, the company’s doctor. Dr. Rabin said the plaintiff complained of pain in the shoulder, at the base of her neck, in her arm and thumb. He gave her medication and administered diathermy treatments for several days. From her complaints his diagnosis was “contusion of the upper neck area.” Dr. Rabin sent her to Dr. Houston, an orthopedic surgeon, who specializes in practice relating to industrial accidents. Neither of these doctors could find any objective symptoms to justify her complaints. They thought she was able to perform her work. Dr. Houston sent her to Dr. Soboloff.
Dr. Soboloff first examined her on October 10, 1958. He could find no clinical evidence compatible with her complaints. He found the right arm one quarter of an inch larger than the left arm, and on his examination on May 22, 1959, the size of the right arm was reduced to same size as that of the left. This condition he said would be indicative of disuse of the right arm, though to what extent he could not tell. This doctor thought she was not disabled.
About the time she went to Dr. Soboloff the company’s doctor, she also went to her own doctor, Dr. Montelepre, who she said, advised her to stop work and rest up, which *178 she did, about September 10, 19S8. Dr. Montclepre died and, of course, did not testify.
Dr. Wall, a specialist in neurology and psychiatry, testified for the defendants. He said he examined the plaintiff on February 17, 1959. , He found no evidence of pathological disfunction of the nervous system. At first he said he found some numbness to sensation in the right hand, forearm and shoulder, but later he changed that to say that this was a subjective finding. Dr. Wall was rather positive in his opinion that the plaintiff was not suffering with an emotional reaction commonly referred to as traumatic neurosis.
The plaintiff first saw Dr. Salatich, an orthopedist, March 2, 1959. This doctor •found marked tenderness in the muscle attachments of the neck to the base of the skull on the right side and between the shoulder blades and some loss of skin sensation of the right arm and the right side of the neck. He explained that the nerve root where she was struck by the bottle supplied the upper extremities to the end of the fingers, and that an injury such as she received would cause “protracted deep-seated, harassing and distressing pain.”
Dr. Winkler and Dr. Fleetwood, both psychiatrists, testified for the plaintiff. The testimony of each of these doctors is essentially the same. Their examinations consisted of permitting the plaintiff to recite her life history including the subject accident. Based on what she told them in one short interview, these psychiatrists concluded that she was totally disabled because of neurotic reaction brought on by this trauma. It is not necessary to give a synopsis of their testimony for the reason that while we have concluded that the plaintiff is disabled as a result of this accident, we do not believe that her disability is caused by neurosis. Further comment hereinafter will disclose our reasons for this conclusion.
The plaintiff was an orphan at an early age and grew up in a home for orphan girls. She married at the age of 16 and two children were born to that marriage. The husband was an alcoholic and would not support his family. There were many separations and that-marriage was dissolved by divorce. She is no stranger to misfortune but there is not a word of evidence to show that she was the type of person to brood over bad luck. No doubt she had more than her share of the vicissitudes of life. The evidence indicates that she is now happily married and one girl was born to this present union. She has worked from time to time at various places to help support the family and she has a good work record. She continued to work after this accident, putting in 96 hours each two week period until she quit of her own accord about September 10, 1958, because of pain and the developed physical disability in her right arm, hand and thumb.
This case was tried on October 26th, 27th and November 6th, 1959. The plaintiff testified at some length on both direct and cross examination. The record of her testimony does not disclose any indication of irrational, emotional or mentally unbalanced attitude. Her answers are sensible and conservative. We are convinced that this lady worked as long as she could and her description of her pain and disability, supported by the testimony of her neighbors, husband, and fellow workers, leaves us in the firm conviction that her physical troubles following this accident are grounded in truth and not in fabrication, imagination or mental disorder and reaction.
In the written reasons given by the trial court is this observation.
“ * * * The Court observed the plaintiff over a period of several days, and it does appear to the Court that this lady is experiencing pain and suffering to such an extent that she is considered disabled within the purview of the unemployment compensation law. However, the Court is of the opinion that she has failed to show that her present condition was caused as a result of being struck by the bottle. The Court is *179 convinced that it was not only after the plaintiff was dismissed from her employment that she began to exhibit this neurosis or reaction. Even considering the testimony of the palintiff’s experts, which was to the effect that this lady is suffering from resentment of the company for whom she worked and dissatisfaction with her husband, her family, and her childhood, it is difficult to see how these experts can say that the traumatic episode which triggered her neurosis was being struck by a bottle any more than it could have been triggered by her being dismissed or any other emotional crisis which she may not have disclosed. This plaintiff has not convinced the Court that her present suffering and injuries are as a result of her being injured while in the scope and course of her employment.”
In the first place, there was no evidence that the plaintiff was dismissed by her employer. She quit on the advice of her own doctor and because she was getting no relief from the doctors to whom the company sent her. For several weeks her employer’s manager paid no attention to her complaints and it appears that he was wholly indifferent and unnecessarily sarcastic. It was only' when she told him that unless she got some relief she would be compelled to quit that he sent her to the company’s doctor.
In the second place the court stated that he bases his statement that she is suffering pain and is now disabled on the opinions of plaintiff’s experts that she shows resentment for the company for whom she worked, and dissatisfaction with her husband, her family and her childhood. Undoubtedly she was not happy with her first husband, but that was years ago. She voiced no dissatisfaction with her present husband or her family. These phases were injected by the psychiatrists. By reading her own testimony given on the trial of this case when she was asked every kind of question the lawyers could think of, no such conclusions can reasonably be deduced. It is obvious that the psychiatrists have accepted her life history as sufficient to place her in a mental or an emotional pattern, which from their studies and experience they may have applied properly to other people who did react adversely to disturbing occurrences, but that does not make it positive that she must fall into the same category. We have her testimony from her own lips, and we prefer to consider it rather than to consider what the doctors say she told them. Nothing in her testimony is suggestive of mental imbalance. It requires no expert at interpretation to appraise her testimony as depicting a woman possessing some poise and self-assurance, though perhaps somewhat crude and unlettered, and completely free of neurotic exhibitions or tendencies.
The judge said that there might have been some other occurrences which she may not have disclosed. We certainly can give no consideration to that possibility. Dr. Wall, a witness for defendants, said that definitely she was not suffering from any type of traumatic neurosis. This doctor, as well as Dr. Winkler and Dr. Fleetwood, said she became angry at her employer when she was refused compensation and she decided to do something about it, meaning, we take it, by fair or foul methods, but her testimony does not reveal vindictiveness. The statement that she quit work when she was told that she could get no compensation is completely erroneous. She did not quit work until advised to do so by her own' doctor. Moreover, on one occasion, when she told Mr. Schexnaydre that if he did not send her to a doctor she would go to her own doctor, he told her that if she did she would get no compensation. Her reply was that she was not looking for compensation but she was looking for relief. It is passing strange that her statements to these doctors could be any different from her testimony on the witness stand. The opinions of Dr. Winkler and Dr. Fleetwood that she is neurotic are not verified in any manner with any tests, physical, mental or psychological. They heard her statement and wrote their diagnosis that she had no pain but was disabled *180 because she believed she had pain. If this accident was of sufficient severity to transform this person from an individual living a normal life with her husband and children to one afflicted with such a neurotic state to the extent that she lost her reasoning powers, then it must have been more than a slight accident, and enough to result in actual and not imaginative pain and disability.
The employer did not produce its manager, Mr. Schexnaydre, as a witness, but in lieu of his testimony counsel entered a stipulation that he would testify that the first he heard of the accident was on August 28, 1958. It is well established that this plaintiff reported the accident to him in the automobile on the same morning after it happened when he was transporting the plaintiff and other employees to their homes and that she made complaints to him almost daily thereafter for at least a month. The lady who was employed by Underwood Glass Company as the immediate supervis- or in the plant, whose name was Ruth, was not called as a witness.
The medical testimony in this case is in disagreement. There is nothing in the record to raise any doubt as to the veracity and honesty of the plaintiff, except some of the doctors thought her purpose was “to get even with the company,” which was purely an assumption and not impressive. Therefore, we adhere to the principle that we must necessarily accord great weight to plaintiff’s statements, and give due consideration to the testimony of her corroborating witnesses, particularly insofar as they relate to these complaints as being the result of the accident. The proof of that phase of the case is positive and decisive and the defendants made no effort to disprove it except by negative testimony of the company doctors. The court found her to be disabled within the purview of the law at the time of the trial but gave greater weight to the experts who did not attribute her condition' to the accident because of absence of objective symptoms. The trial court heard her testify and observed her carefully, during the three days of the trial of this case and he believed that her complaints were genuine to the extent that he made a positive finding of total disability. We agree with that part of his findings. Dixon v. W. Horace Williams, La.App., 8 So.2d 724; Vidrine v. American Employers Ins. Co., La.App., 129 So.2d 288, 291; Powell v. Travelers Ins. Co., La.App., 58 So.2d 563; Sellers v. T. J. Moss Tie Co., La.App., 56 So.2d 878; Garrett v. Gay-lord Container Corp., La.App., 71 So.2d 373; Rutherford v. Frost Lumber Industries, La.App., 57 So.2d 914; McAlister v. Liberty Mutual Insurance Company, La. App., 87 So.2d 354; Fourchea v. Maloney Trucking and Storage, La.App., 88 So.2d 82; W. Horace Williams Company v. Serpas, 5 Cir., 261 F.2d 857, 860.
Plaintiff’s attorney grounds this claim on the theory that the plaintiff is suffering from traumatic neurosis. That is not proven to our satisfaction. Reiterating part of what we have said above, she made her complaints from the time of the accident to her employer, to her supervisor Ruth, to all the doctors, to her fellow workers, her family, her neighbors and friends and, finally to the court, always the same, and there is no evidence to disprove it except the opinions of defendants’ doctors that they could find no objective basis for the complaints. Whether her pain and resulting disability are real, and we believe they are, or whether they stem from emotional reactions makes no difference. While we have expressed our belief that her complaints are real actually we are not required to classify them. Dixon v. T. J. Moss Tie Co., La.App., 70 So.2d 763, citing Christy v. Brown Paper Mill Co., La. App., 27 So.2d 917 and Clifton v. Glassell-Tay lor Co., La.App., 19 So.2d 590.
The plaintiff’s suit asks for statutory penalties to be assessed against the defendants for refusing to pay compensation with the allegation that refusal to pay was arbitrary and capricious. In order to determine whether the refusal was arbi *181 trary and capricious we turn to the record and find that the plaintiff, while still working on the job was sent by her employer to Dr. Rabin on August 28, 1958. Then, on October 9, 1958, she was examined by Dr. Houston. On October 10, 1958 she was examined by Dr. Soboloff. On these examinations by these employer and insurance company doctors, the employer had medical advice that the plaintiff was not disabled. It is true that the plaintiff had made consistent and repeated complaints to her supervisors that since the accident she was never free of pain. At the same time she continued to work. The company did not receive medical reports that she was disabled until about the time or after this suit was filed. After the matter got in court, under the circumstances of this case, the defendants then joined in bringing about a judicial determination of the issue of disability. Under these circumstances we cannot say that the failure to pay was arbitrary and capricious. Penalties will not be allowed.
For these reasons, the judgment appealed from is reversed, and it is now ordered, adjudged and decreed that there be judgment in favor of the plaintiff and against the defendants for workmen’s compensation in the sum of $35.00 per week for the period beginning August 7, 1958, not to exceed 400 weeks with legal interest from the maturity of each weekly installment until paid, all accrued installments and interest thereon to be paid in a lump sum, all costs to be paid by defendants.
Reversed.